

FILED

OCT - 9 2009

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

*POSTED ON WEBSITE*
*NOT FOR PUBLICATION*

# UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

In re:                              )    Case No. 09-29162-D-11
                                    )
SK FOODS, L.P.,                     )    Docket Control No. MSS-2
                                    )
                 Debtor.            )
_____ )
                                    )
In re:                              )    Case No. 09-29161-D-11
                                    )
RHM INDUSTRIAL/SPECIALTY FOODS,     )    Docket Control No. MSS-2
INC.,                               )
                                    )    DATE:  September 29, 2009
                 Debtor.            )    TIME:  10:00 a.m.
                                    )    DEPT:  D

**This memorandum decision is not approved for publication and may not be cited except when relevant under the doctrine of law of the case or the rules of claim preclusion or issue preclusion.**

### MEMORANDUM DECISION

### I. Introduction

SS Farms, LLC; SSC Farming, LLC; SSC Farming 1, LLC; SSC Farming 2, LLC (collectively the "Farm Entities"); and Scott Salyer ("Salyer") have brought a Motion to Remove Trustee and Disqualify Counsel for Trustee; For Protective Order Striking Complaint and Excluding Evidence Taken in Violation of Moving Parties' Constitutional and Common Law Rights and In Violation of Ethical Standards, Docket Control No. MSS-2 (the "Motion" or "Motion to Remove Trustee").

The Motion is opposed by the chapter 11 trustee in this case, Bradley D. Sharp (the "trustee"), the United States Trustee, and the Official Committee of Unsecured Creditors in

this case.   In addition, the trustee has brought an Amended
Counter-Motion for an Order Authorizing the Trustee's Continued
Possession of and Review of Information in His Possession and
Which Relates to Non-Debtor Entities (the "Amended Counter-
Motion" or "Counter-Motion").   The Counter-Motion is opposed by
Salyer and the Farm Entities.

For the reasons set forth below, the court will deny the
Motion and grant in part the Counter-Motion.

## II. Background

SK Foods, L.P. ("SK Foods"), and RHM Industrial/Specialty
Foods, Inc. ("RHM" and, together with SK Foods, the "debtors")
are processors of tomato products.   According to Salyer and the
Farm Entities, Salyer and his related entities, directly or
indirectly, own SK Foods, and the Farm Entities are owned,
directly or indirectly, by Salyer and/or his children.

On May 5, 2009, certain creditors filed involuntary chapter
11 petitions against the debtors as Case Nos. 09-28955 and 09-
28956.[1]   Two days later, the debtors filed voluntary chapter 11
petitions.   On June 18, 2009, the court substantively
consolidated the SK Foods involuntary and voluntary cases and the
RHM involuntary and voluntary cases.

The same day the debtors filed their voluntary petitions,
they also filed a motion in each case for the appointment of a
chapter 11 trustee.   The motions were granted, and the United
States Trustee's appointment of Mr. Sharp as chapter 11 trustee

---

1.   Unless otherwise indicated, all Code, chapter, section
and Rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-
1330, and to the Federal Rules of Bankruptcy Procedure, Rules
1001-9036.

- 2 -

1 in each case was approved by order dated May 18, 2009. By orders
2 dated July 15, 2009, the court authorized the trustee to employ
3 the firm of Schnader Harrison Segal & Lewis, LLP, as his counsel
4 in each case.

5 Shortly after his appointment, the trustee took possession
6 of the debtors' books and records and those of related entities,
7 including Salyer and the Farm Entities, that kept their books and
8 records on SK Foods' premises and in its computers. The trustee
9 then filed a motion and an adversary complaint in the SK Foods
10 case that ultimately triggered the filing by Salyer and the Farm
11 Entities of the Motion to Remove Trustee. First, on June 9,
12 2009, the trustee filed a motion for an order determining that
13 certain wastewater discharge agreements between one or the other
14 of the debtors, on the one hand, and one or another of the Farm
15 Entities, on the other hand, were executory as of the
16 commencement of the cases, and therefore, subject to assumption
17 or rejection by the trustee (the "Wastewater Motion").[2] On June
18 12, 2009, the trustee filed an adversary complaint seeking to
19 substantively consolidate a large number of entities allegedly
20 owned and controlled by Salyer, including the Farm Entities, and
21 the assets of those entities into the debtors' bankruptcy estates
22 ("the Adversary Complaint").[3]

23 / / /

24

25 2. Chapter 11 Trustee's Motion for Order Determining that
Wastewater Discharge Agreements with Related Parties Constitute
26 "Executory Contracts" for Purposes of 11 U.S.C. §365, filed June
9, 2009.

27 3. Adversary Complaint for (1) Substantive Consolidation
(2) Declaratory Relief (3) Recovery of Fraudulent Transfers,
28 filed June 12, 2009, and assigned Adv. No. 09-2342.

On August 7, 2009, Salyer and the Farm Entities filed the Motion to Remove Trustee. They allege that Salyer's and the Farm Entities' files and records are confidential vis-à-vis the trustee and in many instances protected by the attorney-client privilege or the work product doctrine. They allege further that the trustee's and his counsel's actions with respect to the files and records of Salyer and the Farm Entities violated and continue to violate their privacy rights under the California Constitution and the Fourth Amendment to the United States Constitution and, as to the trustee's counsel, the California Rules of Professional Conduct, and constitute conversion. Accordingly, Salyer and the Farm Entities ask the court to remove the trustee, disqualify his counsel, dismiss the Adversary Complaint, exclude from evidence documents the trustee allegedly unlawfully obtained, and require the trustee and his counsel to account for every record they accessed.

On September 1, 2009, the trustee filed the Amended Counter-Motion, in which he alleges that Salyer and the Farm Entities' actions are inconsistent with the maintenance of a privacy interest or privilege in their records vis-à-vis the debtors and the trustee. The trustee therefore requests an order confirming his authority to possess and control the records in question.

The court has reviewed the parties' respective memoranda of points and authorities, oppositions, supporting declarations, exhibits, and replies, with regard to both the Motion and the Counter-Motion. The court heard oral argument on September 29, 2009.

/ / /

- 4 -

1    Preliminarily, the court has considered Salyer and the Farm
2    Entities' separate statements of material disputed facts, filed
3    in connection with both the Motion and the Counter-Motion, and
4    their objections to the admission of certain evidence.  The court
5    has not found it necessary for purposes of this decision to
6    determine any of the allegedly disputed facts or to rely on any
7    of the challenged evidence.  Thus, an evidentiary hearing is not
8    necessary.  For purposes of this decision, and on the basis that
9    it is not necessary that the court rely on the challenged
10   evidence, the court sustains the objections to evidence.

11                          III. Analysis

12   This court has jurisdiction over the Motion pursuant to 28
13   U.S.C. §§ 1334 and 157(b)(1).  The Motion is a core proceeding
14   under 28 U.S.C. § 157(b)(2)(A).

15   A. Standards for Removing a Trustee

16   "The court, after notice and a hearing, may remove a trustee
17   . . . for cause." § 324(a).  The Bankruptcy Code does not define
18   "cause," but it is "well-established that 'cause' may include
19   trustee incompetence, violation of the trustee's fiduciary
20   duties, misconduct or failure to perform the trustee's duties, or
21   lack of disinterestedness or holding an interest adverse to the
22   estate." In re AFI Holding, Inc., 355 B.R. 139, 148 (9th Cir.
23   BAP 2006), aff'd and adopted, 530 F.3d 832 (9th Cir. 2008).  A
24   party seeking removal must set forth and prove specific facts
25   supporting cause. Id.

26   A trustee is the legal representative and fiduciary of the
27   bankruptcy estate. Id. at 147.  His or her primary role is to
28   marshal and sell assets so that their value may be distributed to

                              - 5 -

1  creditors.  Id. at 148.  To that end, a trustee has an

2  affirmative duty to investigate the debtor's financial affairs.

3  11 U.S.C. §§ 704(4), 1106(a)(3).  The trustee at all times must

4  act without regard to his own interests or those of any

5  particular creditor, AFI Holding, 355 B.R. at 147, 148, and must

6  act with "that measure of care and diligence that an ordinary

7  prudent person would exercise under similar circumstances."  In

8  re Rigden, 795 F.2d 727, 730 (9th Cir. 1986).

9      The Farm Entities do not allege that the trustee violated

10 his fiduciary duties.[4]  Their claim for removal is instead

11 predicated on his alleged misconduct with respect to their

12 personal and business records, which they allege violated their

13 state constitutional right of privacy (Article I, section 1 of

14 the California Constitution), their rights under the Fourth

15 Amendment to the United States Constitution, and their rights

16 under the attorney-client privilege and the attorney work product

17 doctrine.

18 B. Standards for Evaluating Privacy, Privilege, Conversion Claims

19      The elements of a claim for violation of the California

20 constitutional right of privacy are "(1) a legally protected

21 privacy interest; (2) a reasonable expectation of privacy in the

22 circumstances; and (3) conduct by defendant constituting a

23 serious invasion of privacy."  Hill v. National Collegiate

24 Athletic Assn., 7 Cal. 4th 1, 39-40 (1994).  The first element is

25 a question of law; the latter two, mixed questions of law and

26 fact.  Id. at 40.  "If the undisputed material facts show no

27 _____

28     4.  For ease of reference, this and subsequent references to
    the Farm Entities will, unless otherwise noted, include Salyer.

- 6 -

1 reasonable expectation of privacy or an insubstantial impact on

2 privacy interests, the question of invasion [of the right of

3 privacy] may be adjudicated as a matter of law." <u>Id.</u>

4      Similarly, "the Fourth Amendment does not proscribe all

5 searches and seizures, but only those that are unreasonable."

6 <u>Skinner v. Railway Executives' Ass'n.</u>, 489 U.S. 602, 619 (1989).

7 "What is reasonable, of course, 'depends on all of the

8 circumstances surrounding the search or seizure and the nature of

9 the search or seizure itself.'" <u>Id.</u>, quoting <u>United States v.</u>

10 <u>Montoya de Hernandez</u>, 473 U.S. 531, 537 (1985).

11      The party charging a violation of the Fourth Amendment "must

12 show that he had a reasonable expectation of privacy in the place

13 searched." <u>United States v. Heckenkamp</u>, 482 F.3d 1142, 1146

14 (2007), citing <u>Rakas v. Illinois</u>, 439 U.S. 128, 143 (1978). "An

15 individual has a reasonable expectation of privacy if he can

16 'demonstrate a subjective expectation that his activities would

17 be private, and he [can] show that his expectation was one that

18 society is prepared to recognize as reasonable.'" <u>Heckenkamp</u>, 482

19 F.3d at 1146, citing <u>United States v. Bautista</u>, 362 F.3d 584, 589

20 (9th Cir. 2004).

21      Among the factors the court may consider are

22      the [individual's] possessory interest in the property
       searched or seized, <u>see</u> <u>United States v. Broadhurst</u>,
23     805 F.2d 849, 852 n.2 (9th Cir. 1986), the measures
       taken by the defendant to insure privacy, <u>see id.</u>,
24     whether the materials are in a container labeled as
       being private, <u>see id.</u>, and the presence or absence of
25     a right to exclude others from access, <u>see</u> <u>Bautista</u>,
       362 F.3d at 589.

26

27 <u>Heckenkamp</u>, 482 F.3d at 1146.

28 / / /

                              - 7 -

1    The right of privacy, under both the California Constitution

2  and the Fourth Amendment, may be waived by consent.  Hill, 7 Cal.

3  4th at 26 (California Constitution); Schneckloth v. Bustamonte,

4  412 U.S. 218, 222 (1973) (Fourth Amendment).

5    The attorney-client privilege may be waived by voluntary

6  disclosure, United States v. Plache, 913 F.2d 1375, 1379 (9th

7  Cir. 1990), citing Clady v. County of Los Angeles, 770 F.2d 1421,

8  1433 (9th Cir. 1985).  The party asserting the privilege must

9  prove he or she has not waived it.  Weil v. Investment/

10  Indicators, Research & Mgmt., Inc., 647 F.2d 18, 25 (9th Cir.

11  1981).  Id.  "Because it impedes full and free discovery of the

12  truth, the attorney-client privilege is strictly construed."

13  Id. at 24.

14    Waiver of the privilege may be express or implied.  In re

15  Oracle Securities Litigation, 2005 U.S. Dist. LEXIS 46931, *21

16  (N.D. Cal. 2005).  "An express waiver occurs when a party

17  discloses privileged information to a third party who is not

18  bound by the privilege, or otherwise shows disregard for the

19  privilege by making the information public."  Id.[5]

20        An 'express' waiver need not be effectuated by words or
          accompanied by the litigant's subjective intent.
21        [Citation] Rather, the privilege may be waived by the
          client's . . . actions, even if the disclosure that
22        gave rise to the waiver was inadvertent.

23  Bittaker, 331 F.3d at 720, n.4.  Like the attorney-client

24  privilege, the protection of the attorney work product rule may

25

26        5.  By contrast, "[a]n implied waiver arises where a party
    asserts a claim that places at issue privileged matter" (id. at
27  719), such as where a client puts his or her attorney's
    performance at issue during the course of litigation.  See
28  Bittaker v. Woodford, 331 F.3d 715, 719-20 (9th Cir. 2003).

- 8 -

1  be waived.  Oracle at *18, citing United States v. Salsedo, 607

2  F.2d 318, 320 (9th Cir. 1979).

3      Finally, the court looks to state law to determine whether a

4  conversion has occurred.  Petralia v. Jercich (In re Jercich),

5  238 F.3d 1202, 1206 n.16 (9th Cir. 2001), citing In re Bailey,

6  197 F.3d 997, 1000 (9th Cir. 1999).  The elements of a conversion

7  in California are (1) the plaintiff's ownership or right to

8  possession of property; (2) the defendant's conversion by a

9  wrongful act or disposition of property rights; and (3) damages.

10  Farmers Ins. Exchange v. Zerin, 53 Cal. App. 4th 445, 451 (1997).

11      However, "a plaintiff in a conversion action must also prove

12  that it did not consent to the defendant's exercise of dominion."

13  Bank of New York v. Fremont General Corp., 523 F.3d 902, 914 (9th

14  Cir. 2008), citing Farrington v. A. Teichert & Son, Inc., 59 Cal.

15  App. 2d 468, 474 (1943) ["there can be no conversion where an

16  owner either expressly or impliedly assents to or ratifies the

17  taking, use or disposition of his property."].

18  C. Discussion

19      The Farm Entities rely primarily on In re Truck-A-Way, 300

20  B.R. 31 (E.D. Cal. 2003), in which an attorney for a chapter 7

21  trustee obtained an ex parte order purportedly authorizing him to

22  enter and search certain residences located outside the district

23  and to seize items that were property of the estate.  The

24  attorney used intimidation by way of the presence of armed deputy

25  U.S. Marshals to gain entrance to a private residence over the

26  objection of its occupants, a mother with her two small children.

27  The resulting search encompassed a bedroom and included dressers

28  and other personal belongings.  The attorney seized the titles to

- 9 -

two vehicles and a key for a storage locker, from which he seized boxes of documents.  The court, noting that the attorney's actions were "unlike anything to come before this court," 300 B.R. at 35, disqualified counsel.  Id. at 40.

The Truck-A-Way case is inapposite here.  Indeed, its facts are so glaringly different from those in the case at hand that the Farm Entities' need to rely on it undercuts their argument.

No one is alleged to have forcibly entered a private residence or any other premises to which the trustee did not lawfully have access. Instead, pursuant to his duty to investigate the debtors' affairs, see § 1106(a)(3), the trustee took control over the debtors' business records at SK Foods' business premises and on SK Foods' computers.[6]

---

[6]    The Farm Entities' heavy reliance on United States v. Comprehensive Drug Testing, Inc., 2009 U.S. App. LEXIS 19119 (9th Cir. 2009), is similarly flawed.  That case concerned the government's execution of a warrant for electronic records of steroid drug testing on professional baseball players, and its seizure of records of persons, baseball players and others, other than those named in the warrant.  That case lacked the element of ownership and control, present in this case, between those named in the warrant and the third parties whose records were also searched.  Further, the case did not implicate bankruptcy considerations in any way, or a trustee's duties under the Code, and the search and seizure took place at premises at which the government agents otherwise had no right to access.  Finally, the question of waiver, as discussed below, was not in play in Comprehensive Drug Testing.

The bankruptcy cases cited by the Farm Entities, In re White House Decorating Co., 607 F.2d 907 (10th Cir. 1979); In re Skinner, 336 B.R. 316 (Bankr. N.D. Ohio 2005); United States v. Patrick, 916 F. Supp. 567 (N.D. W.Va. 1996); and In re Asia Global Crossing, Ltd. 322 B.R. 247 (Bankr. S.D.N.Y. 2005), either do not stand for the propositions for which they are cited (White House Decorating) or are inapposite (Skinner – whether a trustee may search a non-debtor's residence; Patrick – whether a trustee may consent to government's search in criminal case of non-debtor premises; Asia Global Crossing – whether waiver occurred in
(continued...)

- 10 -

## 1. Storage of and Access to Paper and Electronic Records

As it happened, most of the Farm Entities' paper records, including financial, legal, and business records, were located at SK Foods' places of business or in storage units under SK Foods' control.  Declaration of Shondale Seymour in Support of Opposition to the Motion to Remove Trustee, filed August 19, 2009 ("Seymour Decl."), ¶¶4, 8, 9.

Similarly, the debtors' and the Farm Entities' electronic records were stored on computer systems at SK Foods' premises -- before June 2008, on an AAS Enterprise system or in Lotus or Excel workbooks owned and maintained by the debtors, Seymour Decl. ¶15, and after June 2008, on Microsoft Dynamics Axapta ("DAX") software.  Id. at ¶16.  Both the e-mail system and the DAX systems servers were used collectively by SK Foods and the Farm Entities.  Declaration of John Matthew Gallegly in Support of Opposition to the Amended Counter-Motion ("Gallegly Decl.") ¶¶6, 7.  Although access to records stored on these servers was restricted, id. at ¶¶9,10, Dan Kline, SK Foods' Vice President of Information Technology, and his staff had access to all these records.  Kline Declaration in Support of Opposition to Motion to Remove Trustee, filed August 19, 2009, ¶8.[7]

In short, virtually all electronic documents relating to the debtors and the other Salyer entities, including the Farm Entities, were stored on computer systems maintained by SK Foods,

---

6.(...continued)
virtue of corporate e-mail policy).

7.  "My staff and I had access to everything on the network, 24/7, 365 days a year to keep the network up and managed, and my responsibilities required me the access to review, organize and analyze files of the Salyer-Related Entities and Affiliates on a regular basis."  Id.

1  and the e-mail communications of all the companies were stored on
2  a server maintained by SK Foods.  Seymour Decl. §§17, 18.[8]
3      Shondale Seymour was the Chief Financial Officer of the
4  debtors, and between June 2008 and April 10, 2009, was also the
5  CFO of the Farm Entities.  As such, she was "involved in
6  financial management, financial planning, and record keeping."
7  Seymour Decl. ¶1.  With limited exception, all administrative and
8  operations support for the Farm Entities, including human
9  resources, administration, IT functions, and accounting, was
10 provided by SK Foods, through its resources and staff.  Id. ¶8.
11     Indeed, the Farm Entities concede that they "stored and
12 regularly accessed their financial, business, estate planning and
13 other personal documents at SK Foods, LP[,]" and that SK Foods'
14 personnel "performed accounting and record keeping services for
15 the Farm Entities," albeit with an allocation of expenses.
16 Points and Authorities in Support of Motion to Remove Trustee,
17 filed August 7, 2009 ("P. & A."), at 4.
18     The Farm Entities nevertheless insist that SK Foods'
19 employees knew the parties intended "to maintain a separateness
20 and privacy interest in the operating and stored records and
21 data; [and] that the information was confidential[.]"  Id. at 5.
22 To support this conclusion, the Farm Entities rely on the
23 testimony of John Matthew Gallegly, Information Technology
24 Consultant to Salyer American Fresh Foods and an employee of SK
25 Foods (and Scott Salyer's son-in-law), that internal security

26 ————————————
27     8.  For purposes of this decision, the court finds it
   irrelevant which entities paid for, owned, or leased which
28 systems.

- 12 -

1  procedures limited access to the records stored on the DAX

2  systems to particular users.   Gallegly Decl. ¶¶8-12.

3      However, more important is this testimony of Ms. Seymour,

4  not countered by the Farm Entities, which clearly shows that even

5  though there may have been certain limited restrictions, the

6  information was accessible by a number of people:

> At all times during my tenure with the Debtors and any
> and all of the Salyer-Related Entities and Affiliates,
> SK Foods' possession of, access to and review of the
> business records of these other entities was
> specifically approved by Scott Salyer or his designee
> on behalf of the Salyer-Related Entities and
> Affiliates.   Scott Salyer and Mark McCormick . . .
> authorized and instructed me and/or my staff to perform
> specific functions on behalf of these other entities on
> a regular basis.   These functions included, for
> example, the transfer of funds from one entity to
> another.   These tasks (in addition to the general
> responsibilities of handling all accounting) required
> my staff and me to access, review and often make
> entries into the business records of these other
> entities.   We did this in the daily course of our
> responsibilities and at the direction of the most
> senior management, and have been, at all times,
> authorized to do so. . . .   At no time during my tenure
> for the Debtors or for the Salyer-Related Entities or
> Affiliates was I ever advised that I was not to access
> or review business records of the other Salyer-Related
> Entities or Affiliates.   To the contrary, I was given
> responsibilities that required me to access, review and
> analyze those records on a regular basis.

20 Seymour Decl. ¶¶12, 14.

21      The court concludes that with the knowledge and acquiescence

22 of the management of the Farm Entities, and indeed with the

23 permission and at the direction of Scott Salyer, the personal,

24 legal, business, and financial records, both paper and

25 electronic, of Salyer and the Farm Entities were stored at the

26 premises of SK Foods, in storage units maintained by SK Foods, or

27

28

1   on computers at the premises of and maintained by SK Foods.[9]   The

2   court also concludes that with that same knowledge, acquiescence,

3   permission, and direction, these records were routinely accessed

4   and reviewed by employees of SK Foods.

5   2. The Justice Department Raid and the Retention of Counsel

6        The court need not determine whether, as of April 2008, the

7   Farm Entities had a reasonable expectation of privacy concerning

8   their records stored at SK Foods' premises and on computers on

9   those premises.  At that time, representatives of "the Anti-Trust

10  Division of the [U.S.] Department of Justice and other federal

11  agents," with search warrants, raided the premises of SK Foods

12  and seized "an enormous volume of records and copied many other

13  documents and computers . . . ."   P. & A. at 5 n.3.

14       [M]any of the employees were thereafter represented by
         counsel; counsel for SK Foods LP had been active at the
15       corporate headquarters and at the facilities; [and]
         employees of the company had publically plead guilty to
16       federal offenses as had employees of customers, . . . .

17  Id.[10]   The raid must have necessarily put on everyone's radar

18  screen the risk of storing Salyer and the Farm Entities'

19  documents and information on SK Foods' premises and computers and

20  the consequences of leaving possession in the hands of SK Foods.[11]

21  _____

22       9.   The court finds it unnecessary for purposes of this
     decision to determine whether the records of Salyer and the Farm
23   Entities were maintained in locations within the SK Foods
     premises or on its computers that were separate and apart from
24   the records of the debtors.

25       10.   The logical inference is that Salyer personally
     employed counsel, as he was, directly or indirectly, the owner of
26   the various companies, and as such, one of the primary targets,
     if not the primary target, of the investigation.
27

         11.   The court does not mean to suggest that SK Foods is or
28                                            (continued...)

                              - 14 -

1  The court cannot conjure a bigger red flag.

2      The raid was followed by a federal grand jury investigation

3  and criminal informations in which certain parties were charged

4  with mail fraud, wire fraud, bribery, and false and misleading

5  labeling of products.  The defendants have included certain

6  current and former employees of SK Foods.  There have also been a

7  number of class action and other lawsuits filed against SK Foods

8  and others.  See Declaration of Lisa Crist in Support of Chapter

9  11 Petitions and First Day Pleadings, filed May 8, 2009, at 10-

10  11.  The court makes no findings as to the level of involvement

11  of the Farm Entities in those proceedings; however, any

12  suggestion that Salyer, in his capacity as an individual and on

13  behalf of the Farm Entities, or others in charge of the Farm

14  Entities were not fully aware of what was going on would not be

15  credible.  Indeed, there is no such contention.

16      To put it generously, the Farm Entities skirt the issue as

17  to why, with knowledge of the risk attendant to leaving the

18  records at SK's premises, they did not simply remove them before

19  the chapter 11s were filed.  Instead, they devote their attention

20  to their post-petition demands that the trustee cease his review

21  of their records and return the records to them, and the

22  trustee's refusal to do so.  However, by the time the trustee was

23

24      11.(...continued)
    is not a "third party" vis-à-vis the Farm Entities.  The court
25  has no need at this time to determine whether either or both
    debtors are third parties, or are one and the same as one or more
26  of the Farm Entities for purposes of substantive consolidation or
    for any other reason.  The Farm Entities contend that the
27  trustee's position as regards the documents and records is based
    on such an identity.  The court bases the present decision on
28  other grounds.

- 15 -

appointed, the Farm Entities no longer could have had any
reasonable expectation of privacy as regards their records stored
at SK Foods and on its computers, and to whatever extent they
previously had such an expectation, they clearly waived it when,
over the course of a full year, they failed to take any steps
whatsoever to remove their documents from the possession and
control of SK Foods and failed to instruct employees of SK Foods,
including Shondale Seymour and Lisa Crist, to cease their review
of such records. Seymour Decl. at ¶¶ 12, 14; Declaration of Lisa
Crist in Support of Response to the Motion to Remove Trustee,
filed August 19, 2009, at ¶¶ 13, 14.

Viewed in this light, the Farm Entities' contention that
they had no time to remove their records from the debtors'
possession because the bankruptcies were "abruptly initiated
involuntarily" by their lenders defies credibility.[12]  The Justice
Department raids preceded the filing of the involuntary petitions
by over a year.  The debtors retained the national law firm of
Winston & Strawn LLP in February 2009, three months prior to the
filings, to assist with preparation of the filings and sale of
the debtors' assets, and to assist in responding to the federal
criminal investigation.  Seymour Decl. at ¶29.  By the time of
the filings, Winston had "accumulated extensive knowledge of the
[d]ebtors' business and engaged in negotiations with parties in
interest" to such an extent that it had accrued fees and costs
totaling $1,436,500.  Declaration of Richard A. Lapping in
Support of Application for Authority to Employ Winston & Strawn

---

12. Reply in Support of Motion to Remove Trustee, filed
September 22, 2009 (the "Reply"), at 5 n.3.

- 16 -

1  LLP as Special Counsel to Chapter 11 Trustee, filed June 2, 2009,

2  at ¶¶3(a), 5.

3      Finally, on April 10, 2009, almost a month prior to the

4  filings, Salyer and certain of his entities retained the national

5  law firm of Kasowitz, Benson, Torres & Friedman LLP.  Seymour

6  Decl. at ¶31.  Attorneys at Kasowitz "had a great deal of

7  interaction" with Richard Lapping, of Winston & Strawn, prior to

8  the chapter 11 filings.  Supplementary Declaration of Donald J.

9  Putterman in Support of Reply in Support of Motion to Remove

10 Trustee, filed September 22, 2009, at ¶22.

11     On April 16, 2009, Donald J. Putterman, of the Kasowitz

12 firm, sent a letter to the managing director of one of the

13 debtors' lenders referencing the lenders' threat to file

14 involuntary bankruptcy proceedings.  Affidavit of Lawrence

15 Mizera, filed under seal on August 20, 2009, Ex. A.  The next

16 day, an attorney for that lender responded to Mr. Putterman,

17 stating:

18     As you know, the Lenders are owed in excess of $190
       million, certain proceeds of which, on information and
19     belief, have been drained from the Borrowers [the
       debtors] to affiliated non-borrowers and for the
20     personal benefit of related parties.

21 Affidavit of James Spiotto, filed under seal on August 20, 2009,

22 Ex. A.

23     Thus, at least as early as April 17, 2009, Salyer's personal

24 counsel was clearly on notice of the potential of involuntary

25 bankruptcy proceedings and of the suspicion on the part of the

26 debtors' major lenders that improper insider transfers had taken

27 place.

28 / / /

- 17 -

It is clear Salyer had sophisticated legal advice, knew of the contemplated chapter 11 filings, and knew the major lenders were suspicious of improper insider dealings.  At some point, he authorized the voluntary filings, then requested a chapter 11 trustee be appointed, and knew or certainly should have known a chapter 11 trustee is mandated to investigate the debtor's books and records, financial affairs, assets, liabilities, and dealings with others, especially insiders.[13]  In circumstances where the debtors' major lenders had already raised the prospect of inappropriate transfers, Salyer must have known a trustee's attention would be drawn to the records of all the related entities, not just those of the debtors.

In truth, the Farm Entities had endless opportunities to segregate and remove their records from the debtors' records before the debtors filed their voluntary petitions, but chose not to.  By the Farm Entities' own account, to do so would have been easy since their files were separately labeled.  P. & A. at 12. Under all these circumstances, the trustee's taking control of all records located at the debtors' premises and on the debtors'

---

13.  Not only did Salyer and his counsel contemplate the appointment of a chapter 11 trustee from the very beginning of these cases, they also had in mind the particular individual who was ultimately appointed.  In their motion, the debtors were complimentary of Mr. Sharp's background, experience, and effectiveness as a chapter 11 trustee, and expressly requested that the Office of the United States Trustee consider appointing him.  The Bank of Montreal indicates in its joinder in the motion to appoint a chapter 11 trustee, filed May 11, 2009, that Mr. Sharp "[had] already begun to familiarize himself with the operations of the [d]ebtors . . . ."  Salyer was clearly part of a very small group that hand-picked Mr. Sharp for this role.

- 18 -

1   electronic systems was not only foreseeable but to be expected.[14]

2       The Farm Entities attempt to put the onus on the trustee,

3   charging him with searching through the documents to segregate

4   and return those allegedly not belonging to the debtors, without

5   himself reviewing their contents, or alternatively, with seeking

6   instruction from the court as to how to perform his statutory

7   duties.  Under the circumstances presented here, the court would

8   not put the trustee in such an untenable position.

9       Also unavailing is the Farm Entities' argument that portions

10  of the documents in question have nothing to do with the

11  Wastewater Motion or the allegations in the Adversary Complaint.

12  The scope of a trustee's duties and of his legitimate access to

13  books and records is, of course, never limited by the subject

14  matter of motions and adversary complaints already on file.

15  Finally, the court rejects the Farm Entities' contention that the

16  trustee should be precluded from using the documents or their

17  contents against the Farm Entities.

18      In short, represented by counsel, the Farm Entities chose

19  not to act.  In effect, the Farm Entities ask the court to shield

20  them from the direct and clearly foreseeable consequences of

21  their own ill thought-out and imprudent choices.  This the court

22  _____

23      14.  "The absence of a right to exclude others from access
    to a situs is an important factor militating against a legitimate
    expectation of privacy."  Bautista, 362 F.3d at 589, citing

24  Rawlings v. Kentucky, 448 U.S. 98, 105 (1980).  Thus, where a
    hotel guest's stay has run, he or she no longer has a legitimate

25  expectation of privacy in the hotel room.  Bautista at 589.

26      Similarly, in this case, Salyer gave up the right of access
    to SK Foods' premises, including computers on those premises,

27  when he authorized the debtors to request the appointment of a
    chapter 11 trustee.  With the right of access, he also gave up

28  any reasonable expectation of privacy.

- 19 -

1  will not do.

2  ## IV. Conclusion

3  Whether a party has a reasonable expectation of privacy is a

4  context-specific inquiry.  Leonel v. Am. Airlines, 400 F.3d 702,

5  712 (9th Cir. 2005).  The question of consent is similarly to be

6  determined based on the totality of the circumstances.  Hill,

7  7 Cal. 4th at 102 n.15.  Based on the facts of this case, the

8  court finds that the Farm Entities had no reasonable expectation

9  of privacy in records stored at the debtors' place of business,

10 in their storage units, or on their electronic systems; or, in

11 the alternative, that the Farm Entities have waived their

12 reasonable privacy expectation in these records by not removing

13 them before the bankruptcy filings.  The court thus concludes

14 that the trustee did not run afoul of the Fourth Amendment.[15]

15 For the same reason, the court also finds that the Farm

16 Entities, as against the debtors and the trustee, waived their

17 right of privacy in the records at issue, and that the trustee

18 did not convert the Farm Entities' records.  See Kremen v. Cohen,

19 337 F.3d 1024, 1030 (9th Cir. 2003) (putative owner in conversion

20 action must have established a legitimate claim to exclusivity).

21 Finally, based on the Farm Entities' conduct and the

22 analysis set forth above, the court finds that the Farm Entities

23 waived the attorney-client privilege and their rights under the

24

25   15. Because the court finds the Farm Entities had no
     reasonable expectation of privacy, it need not decide whether the
26   Fourth Amendment binds a bankruptcy trustee.  The court notes
     that the cases are divided on this question.  Cf. Truck-A-Way,
27   300 B.R. at 36-37 (trustee is so bound); In re Barman, 252 B.R.
     403, 412-413 (Bankr. E.D. Mich. 2000) (same); In re Kerlo, 311
28   B.R. 256 (Bankr. C.D. Cal. 2004) (trustee is not so bound).

work-product doctrine in the records at issue.[16]

Because the court is persuaded that the Trustee and his counsel did not act improperly, it will deny the Farm Entities' request to disqualify either.  The court will also deny the Farm Entities' requests to dismiss the Adversary Complaint, to exclude evidence obtained as a result of the trustee and his counsel's review of their records, and to require the trustee to account for the records he accessed.  The court will grant the Counter-Motion, but only with respect to Salyer and the Farm Entities' records, since only Salyer and the Farm Entities have had the opportunity to oppose the Counter-Motion.

The court will issue an appropriate order.

Dated:   October  9 , 2009     _____
                               ROBERT S. BARDWIL
                               United States Bankruptcy Judge

---

16. The Farm Entities express concern about the costs presumably imposed by a rule whereby "separate businesses who share administrative functions waive all property rights and privileges" when one such business files for bankruptcy.  Reply at 15.  The better rule, according to the Farm Entities, is that such shared functions (and concomitant information-sharing) cease once a bankruptcy is filed.

The court, though mindful of the Farm Entities' concern, does not agree that requiring parties with notice of a related party's imminent bankruptcy filing to remove their records in order to avoid a finding of waiver will discourage shared administrative arrangements.  In any event, the court's findings as expressed in this decision are limited to the facts of this case.

1

**CERTIFICATE OF MAILING**

2        I, Andrea Lovgren, in the performance of my duties as Deputy
Clerk to the Honorable Robert S. Bardwil, mailed by ordinary mail
3    a true copy of the attached document to each of the parties
listed below:

4

5    Office of the US Trustee
501 "I" Street, Suite 7-500
Sacramento, CA 95814

6

7    Gregory Nuti
Schnader Harrison Segal & Lewis
One Montgomery Street, Suite 2200
8    San Francisco, CA 94104- 5501

9    Dale Ginter
Downey Brand, LLP
10   621 Capitol Mall, 18th Floor
Sacramento, CA 95814-4731

11

12   Donald Putterman
Kasowitz, Benson, Torres & Friedman
101 California Street, Suite 2050
13   San Francisco, CA 94111

14   Malcolm Segal
Segal & Kirby, LLP
15   770 L Street, 1440
Sacramento, CA 95814

16

DATE: October 9, 2009
17

18   _____
Deputy Clerk

19

20

21

22

23

24

25

26

27

28